**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THE FEDERAL DEPOSIT INSURANCE CORPORATION** as Receive for **PARK NATIONAL BANK**, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12 C 3790 |
| **RLI INSURANCE COMPANY**, | ) ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case presents an insurance dispute between Federal Deposit Insurance Corporation ("FDIC"), as receiver for Park National Bank ("Park National"), and RLI Insurance Company ("RLI").  FDIC suffered losses stemming from loans that were purportedly collateralized by equipment leases -- leases that ultimately proved to contain forged signatures and were therefore worthless.  FDIC unsuccessfully sought reimbursement for those losses under a financial institution bond ("the Bond") issued by RLI and, after RLI denied that the losses were covered, commenced this action for breach of contract.

Both sides largely agree in their factual accounts, and accordingly they have filed cross-motions for summary judgment under Fed. R. Civ. P. ("Rule") 56.  Because the few factual disagreements between the parties do not rise to the level of materiality, the issue is appropriate for resolution in this procedural posture.  For the reasons described below, FDIC's loss comes within the scope of the Bond's coverage and FDIC therefore prevails on its motion.

# Summary Judgment Standards[1]

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgments. (Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

As with any summary judgment motion, this Court accepts each nonmovant's version of any disputed facts, but only so long as it is supported by record evidence. Where as here cross-motions for summary judgment are involved, the principles of Rule 56 demand a dual perspective that this Court has sometimes described as Janus-like: As to each motion the nonmovant's version of any disputed facts must be credited, an arrangement that sometimes

---

[1] Both sides have complied with this District Court's LR 56.1, adopted to implement Rule 56. This opinion cites to FDIC's LR 56.1(a)(3) statement as "F. St. ¶ --" and to RLI's LR 56.1(a)(3) statement as "RLI St. ¶ --." Responses to those statements of fact take the form "X R. Y St. ¶--," with "X" denoting the author of the response and "Y" denoting the party to whose statement X responds. LR 56.1(b)(3)(B) statements of additional facts are cited "F. Add. St. ¶ --" and "RLI Add. St. ¶--." Finally, the parties' exhibits to their statements are cited as "Ex.," their memoranda are cited "Mem." and their responsive memoranda are cited "R. Mem."

causes the denial of both motions. In this case that unproductive result has been avoided because the underlying material facts are not in dispute. Instead the parties differ as to the scope of coverage provided by the Bond and as to whether the undisputed facts fall within that scope, issues to which this Court can competently speak in the current posture.

**Facts**

Forged Lease Transactions

This case concerns a series of nested transactions. First of those is a leasing arrangement between equipment lender Sysix Financial, LLC ("Sysix") and Moody Bible Institute of Chicago ("Moody"). On December 14, 2001 Moody's Vice President Robert L. Gunter ("Gunter") executed Master Lease Agreement No. 1121 ("Master Lease") between Moody and Sysix (F. St. ¶ 21) -- an undertaking by Moody to lease equipment from Sysix in the future, with each transaction to be memorialized in a separate Lease Schedule negotiated and executed by Sysix and Moody. Among its provisions, the Master Lease specified that each of those Lease Schedules would incorporate by reference the terms of the Master Lease and "when signed by the parties shall constitute a separate enforceable lease" (RLI Ex. G at 1).

Two Lease Schedules are of interest here: Lease Schedule S080 ("First Lease") dated March 10, 2008 and Lease Schedule S084 ("Second Lease") dated December 8, 2008 (F. St. ¶¶ 24, 39). Both Lease Schedules identified equipment that Sysix would lease to Moody and acknowledged Moody's receipt of that equipment, specified a monthly rent and described the rights and responsibilities of the parties in case of default (F. St. ¶¶ 24-28, 39-43).

Both Lease Schedules were purportedly signed by Sysix President John Sheaffer ("Sheaffer") and by Gunter (F. St. ¶¶ 29, 44). In both cases, however, Sheaffer had forged

Gunter's signature and fabricated the entire leasing transaction (F. St. ¶¶ 30, 45). Indeed, Moody never received any of the equipment described in the forged Lease Schedules (RLI St. ¶ 24).

<u>Park National's Loans to Rockwell</u>

Those fraudulent Leases served as the basis for the loans at issue in this case. In 2008 Rockwell Financial Group, LLC ("Rockwell") approached Park National, a national bank headquartered in Chicago and insured by FDIC (F. St. ¶¶ 1-2), with a request to secure two loans ("the Loans") to finance the purported equipment leases between Sysix and Moody (F. R. RLI St. ¶¶ 13-14).[2] Those two Loans were substantial: Park National paid out $2,978,334.68 on the First Loan and $1,131,989.75 on the Second Loan (F. St. ¶¶ 32, 47). Each Loan corresponded to one of the Lease Schedules supposedly executed by Sysix and Moody. On each Loan Sysix assigned to Rockwell all its right, title and interest in the corresponding Lease -- including the right to receive rental payments -- and Rockwell in turn assigned its right, title and interest in that Lease to Park National as collateral. Repayment of the Loans was to be made in monthly installments, with the amount of each installment paralleling the monthly rent for each Lease (see F. St. ¶¶ 26, 32, 41, 47). After it received lease payments from Moody on the Leases, Sysix was then to make payments directly to Park National (F. St. ¶ 56).

Park National had funded an earlier loan involving a lease financing arrangement to which Sysix was a party, and it had been conducting business with Rockwell for approximately six years before the First and Second Loans (F. St. ¶¶ 60-61). Park National's approval of the Loans at issue here was based on loan presentations made to its officials -- presentations that

---

[2] It remains unclear whether Park National's loan to Rockwell was intended to enable Sysix to purchase the equipment that it intended to lease to Moody or merely to finance already-leased equipment (see F. R. RLI St. ¶ 14). In any event that factual issue makes no material difference to the legal analysis.

included financial statements as well as a summary of Moody's financial position (F. St. ¶¶ 58-59). But those presentations did not include research into the authenticity of the Leases or the existence of the leased equipment -- an inquiry that was later undertaken (before the actual funding of the Loans) by Park National employees Luisa Helmlinger and Mary Herschberg (RLI St. ¶ 25; F. St. ¶ 64).[3] Based on the loan presentations and Luisa Helmlinger's approval, the Loans were funded in 2008 (F. St. ¶¶ 37, 52).

<u>Default and Purchase Agreement</u>

All went smoothly until July 2009, at which point payment on the Loans ceased (F. St. ¶ 68). Park National demanded payment from Sysix and thereafter filed suit against Moody and Rockwell (F. St. ¶ 70).

Soon after, the Office of the Comptroller of the Currency closed Park National, and FDIC was named receiver of the bank (F. St. ¶ 12). FDIC then entered into a Purchase and Assumption Agreement ("Purchase Agreement") with U.S. Bank National Association ("U.S. Bank") (F. St. ¶ 12). Purchase agreements are used by FDIC to minimize the cost of bank liquidations and to maintain public confidence in the national banking system (F. St. ¶ 71). Under the Purchase Agreement U.S. Bank acquired both the assets and liabilities of Park National, but FDIC was required to pay U.S. Bank 80% of the loss on each commercial loan, with U.S. Bank absorbing the remaining 20% of such loss (F. St. ¶ 72). In accordance with that arrangement FDIC transferred the Loans to U.S. Bank and paid U.S. Bank 80% of what FDIC

_____

[3] Disputes persist as to the scope and thoroughness of the inquiry performed by those two employees (see F. R. RLI St. ¶¶ 25-29; RLI R. F. St. ¶¶ 64-68), but those disputes are ultimately immaterial.

characterizes as the total loss on each loan -- $1,560,694.50 on the First Loan and $776,270.78 on the Second Loan (F. St. ¶¶ 73-74).

Financial Institution Bond

All that past history is merely prologue to the present dispute between FDIC and RLI. Soon after learning of the forgery Park National sought coverage of its loss under a financial institution bond ("the Bond") that had been issued by RLI in favor of Park National. Financial institution bonds (a more modern name for what used to be called by the alliterative label "bankers blanket bonds") offer bundled indemnification coverage for various specific risks, typically including financial loss from forgeries, employee dishonesty and theft (see 9A John and Jean Appleman, Insurance Law and Practice § 5701, at 377-78 (1981 and 2010 Supp.)). At issue here is the coverage provided by Insuring Agreement E of the Bond, which protects an insured bank against losses resulting from credit extended on the faith of certain documents that contain forged signatures (F. Ex. 4 at 3):

> (E)      Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> > (1)      . . . extended credit or assumed liability, on the faith of any Written, Original
> >
> > > (a)      Certificated Security,
> > > (b)      Document of Title,
> > >           . . . or
> > > (h)      Security Agreement,
> >
> > which (i) bears a handwritten signature of any . . . lessee . . . or of any other person whose signature is material to the validity or enforceability of the security, which is a Forgery. . . .

Insuring Agreement E also requires "Actual physical possession" of the Security Agreement by the Insured as "a condition precedent to the Insured's having relied on the faith of such items" (id.).

On October 6, 2009 Park National gave timely notice to RLI of its discovery of a potential loss caused by the Rockwell Loans (F. St. ¶ 11). After FDIC was appointed as Receiver for Park National and transferred the Loans to U.S. Bank pursuant to the Purchase Agreement, U.S. Bank settled the action against Rockwell (F. St. ¶ 70). FDIC then filed this action to seek coverage under the Bond for 80% of what it calculates to be the remaining loss after settlement (F. St. ¶¶ 76-77).[4]

### Interpreting Financial Institution Bonds

This Court has ample guidance on which to draw in interpreting the scope of coverage provided by the Bond. That is because the Bond at issue here is an exemplar of Standard Form No. 24, which has been exhaustively interpreted over the past decades (Universal Mortgage Corp. v. Wurttembergische Versicherung AG, 651 F.3d 759, 761 (7th Cir. 2011)):

> A bankers blanket bond, sometimes called a fidelity bond or financial institution bond, offers bundled indemnification coverages for various specific risks, typically including financial loss from forgeries, employee dishonesty, and theft. See 9A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 5701, at 377–78 (1981 & Supp. 2010). The most common bankers blanket bond is the Standard Form No. 24, which has a well-chronicled history. See, e.g., Private Bank & Trust Co. v. Progressive Cas. Ins. Co., 409 F.3d 814, 816 (7th Cir. 2005), and sources cited below. Over the last century, nearly every term in the Form 24 bond has been developed in reaction to court interpretations of prior versions of the bond. As a result, certain terms within the bond carry nuanced and well-established meanings. Peter I. Broeman, An Overview of the Financial Institution Bond, Standard Form No. 24, 110 Banking L.J. 439, 445 (1993).

_____

[4] FDIC has reduced its claim against RLI by $233,600 to reflect anticipated recoveries under the settlement agreement between U.S. Bank and Rockwell (F. St. ¶ 76).

One noteworthy feature of financial institution bonds is that the normal rule of interpretation governing insurance contracts, under which any ambiguity is construed in favor of the insured, cannot be invoked by FDIC.  As <u>First State Bank of Monticello v. Ohio Cas. Ins. Co.</u>, 555 F.3d 564, 568 (7th Cir. 2009) teaches:

> Standard fidelity bonds are drafted by sophisticated parties (representatives of the banking and insurance industries); therefore, the traditional rule of construing any ambiguity in favor of coverage does not apply.

This opinion now turns to the substantive arguments advanced by the parties.[5]  FDIC has undoubtedly sustained a monetary loss stemming from loans that it advanced to Rockwell, relying at least in part on documents that contained forged signatures.  RLI nonetheless offers six arguments as to why FDIC's loss is not covered by Insuring Agreement E:

1. Insuring Agreement E applies only to certain enumerated categories of documents, and the Leases are not included in any of those categories.

2. FDIC did not possess the original documents when it extended credit to Rockwell, as required by the Bond, but instead possessed only the Lease Schedules.

3. Because the Leases were fictitious, FDIC's loss "resulted directly" from that fictitious collateral rather than from forged signatures.

4. Amounts paid to "repurchase" the loans from U.S. Bank (as RLI characterizes that transaction) are indirect losses not covered by the Bond.

5. FDIC did not rely in good faith on the Leases.

---

[5]  To simplify discussion, this opinion will generally use FDIC to refer both to FDIC and to its predecessor-in-interest Park National, except when it is necessary to distinguish between the two actors.

6.       FDIC failed to file the action within the two-year limitations period

specified by the Bond.

For each of those reasons, RLI asserts that it should prevail on its own summary judgment

motion, or at least defeat FDIC's corresponding motion.  This opinion addresses each of RLI's

arguments in turn.

### "Security Agreements" Include the Lease Schedules at Issue Here

Insuring Agreement E covers loss resulting from reliance on forged documents that fall

into one of eight categories.  If the Leases do not fall within any of those categories the loss is

not insured -- and "leases" are not themselves an enumerated category.  FDIC responds to that

potential problem by categorizing the Leases as a type of "Security Agreement," a category

specifically listed in Insuring Agreement E(1)(h) and defined in the Bond as "a Written

agreement which creates an interest in personal property or fixtures and which secures payment

or performance of an obligation" (RLI St. ¶10).

While both parties agree that the key threshold requirements of the Bond are therefore

whether the Leases create "an interest in personal property" and whether they "secur[e] payment

or performance of an obligation," RLI concentrates its fire solely on the first of those elements.

Although it does not expressly concede that the second requirement is not in dispute, its total

silence on the subject equates to an eloquent confirmation that such is the case.

Nonetheless it is worth expending a bit of time on the subject before this opinion turns to

the ground on which the litigants have chosen to do battle.  On that score it is abundantly clear

that the Leases (absent the forgeries, of course) would have secured Moody's payments and

performance and that the Leases in turn secured repayment of the Loans.  As <u>Pine Bluff Nat'l</u>

Bank v. St. Paul Mercury Ins. Co., 346 F. Supp. 2d 1020, 1027-28 (E.D. Ark. 2004) explains

(interpreting leases similar to the ones at issue here):

> The Bond defines Security Agreement as "an agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." The leases at issue meet this definition. Each lease creates a leasehold interest in a copy machine, so each lease creates an interest in personal property. Each lease secures payment of the lessee's obligation. Paragraph 14 of the lease agreement gives the lessor the right, upon lessee's default, under certain conditions, to repossess the equipment; and it requires the lessee to pay the amount in arrears, the expense of retaking possession and removing equipment, court costs and reasonable attorney's fees, in addition to a sum equal to the balance of the rent and other payments for the remainder of the term.

Here too the Leases permit the lessor in case of default to repossess the equipment and to require

payment of arrears, costs of equipment removal and reasonable attorneys' fees (F. Ex. 9 at 4).

Plainly, then, the Leases secured payment of an obligation -- particularly when as here they were

used as collateral for loans. RLI understandably chose to stay mum on this prong of the Bond's

two-part test.

    This opinion therefore shifts to the contested "interest in personal property" issue. RLI

contends that the Leases create no such interest, emphasizing that the Master Lease Agreement

specified that title to the equipment remained vested in Sysix throughout the lease term and that

the equipment itself would be returned to Sysix at the lease's termination (RLI Ex. G at 2-3):

> 6. Prior to termination of a Lease as to any time of Equipment, at its own expense, Lessee shall . . . (iv) return, or cause to be returned, the Equipment to a location as designated by [Sysix] (or [Sysix's] Assignee) within the continental United States of America.
>
>       *     *     *
>
> 7. Each item of Equipment shall remain the personal property of, and the title thereto shall remain in [Sysix] or its Assignee exclusively, and Lessee shall have no right, title or interest therein and no right to purchase or otherwise acquire title to or ownership of such item except as set forth in the related Schedule.

And the same Master Lease also states that "[i]t is the intention of the parties hereto that the Lease constitutes a true lease" (id. at 3) -- terminology that in commercial parlance connotes a relationship that contrasts with a financing transaction (such as a sale-leaseback) in which the lessee rather than the lessor ends up with the reversionary interest in the property at the conclusion of the lease term.[6]

That document proves that the Leases do not transfer title to any equipment, but it does not at all show that the Leases failed to create "an interest in personal property." Instead the Leases do precisely that by granting FDIC a possessory interest in the leased equipment. There is no question that a right to possession is a type of interest: Thus Restatement (First) of Property § 5 (1936) defines an "interest in land or other thing" in this way:

> There are rights, privileges, powers and immunities with regard to specific land, or with regard to a thing other than land, which exist only in a particular person. By virtue of the fact that a person has these special interests, other than and in addition to those possessed by members of society in general, he occupies a peculiar and individual position with regard thereto.

To the same effect, Black's Law Dictionary (9th ed. 2009) similarly lists "possessory interest" as one type of the more generic concept "interest."

Those definitions concur with common sense in confirming a lessee's relationship to leased property as an interest in that property. Had a third party attempted to interfere with Moody's use of the (admittedly fictional) equipment, Moody would have had every right to sue that third party -- and that suit would have been based upon Moody's "interest in personal property." And while neither Black's Law Dictionary nor the Restatement is binding upon this

---

[6] There are a number of negotiated arrangements that may produce that result, such as giving the lessee the right to acquire (or reacquire) the property for a nominal price or for less than its fair market value.

Court in its interpretation of the Bond, those sources are more than powerful evidence as to the commonly understood legal meaning of the undefined term "interest in personal property" as used in a Bond drafted by sophisticated parties. While the Leases disclaim any intent to create an <u>ownership</u> "interest" in the equipment, they obviously do create a <u>possessory</u> "interest" -- and RLI has failed to provide any reason to hold that the Bond's definition of Security Agreement excludes possessory interests.

Moreover, Insuring Agreement E specifically accounts for the possibility of a lessee's signature being forged, listing "lessees" (together with "issuers," "makers," "drawers" and "guarantors") among the signatories covered under the Agreement (F. Ex. 4 at 3). That fact does not by itself win the day for FDIC -- the lessee in question might have executed an exemplar of one of the other categories of documents listed in Insuring Agreement E -- but it provides further evidence that the parties intended the Bond to cover leases among other documents that can qualify as creating interests in personal property.

RLI attempts to circumvent that logic with two arguments. It first relies upon the fact that Park National signed a separate "Security Agreement" with Rockwell -- a choice that RLI argues demonstrates Park National's understanding that the Leases were not themselves security agreements. And RLI cites secondarily to this Court's decision in <u>Cobra Capital, LLC v. Pomp's Services, Inc.</u>, 2010 WL 680947 (Feb. 23, 2010), which held in the context of a UCC dispute that "the most important factor indicating a security agreement, is whether the lessee retains an ownership interest in the property at the termination of the lease."

Those two contentions miss the mark for the same reason: They fail to account for the crucial difference between the definition of "security agreement" in other contexts and "security agreement" in the context of the Bond. That failing is particularly obvious in RLI's citation of

Cobra Capital, which explicitly decided the security agreement issue in the context of the UCC and drew on UCC caselaw in reaching its result,[7] while here the Bond provides its own definition of Security Agreement that has no necessary relation to the definition provided by the UCC. Similarly, RLI's reliance on the separate "security agreement" executed by Rockwell ignores the fact that the term has a special meaning in the context of the Bond. While both the UCC and the Bond employ the terms "lease" and "security agreement," they do so in vastly different contexts and for different purposes. Park National's desire to protect its interests in the event of a default by requiring Rockwell to sign a security agreement has no bearing at all on the issue of whether the Leases "create an interest in personal property" as required for the Bond coverage.

RLI similarly emphasizes that the parties to the Leases did not intend to treat those Leases as "security agreements." That is really a nonsensical argument, for it rests on the fiction that the parties executing a document think about whether that document does nor does not fit within the scope of some other document that is not before them at the time. Instead the key question is simply whether the parties in fact executed a written agreement that (1) created an interest in personal property and (2) secured payment of an obligation -- and for the reasons already articulated here, that question must be answered in the affirmative. In sum, the Leases are accurately categorized as Security Agreements that are covered under Insuring Agreement E.

### FDIC's Possession of the Lease Schedules Satisfied the Bond's Requirements

Next RLI attempts to seize on language in Insuring Agreement E that requires FDIC to have had actual physical possession of a forged security agreement at the time of a loan's

_____

[7] See n. 6 and its accompanying text.

issuance in order to be eligible for coverage (F. Ex. 4 at 3). It is also necessary for an insured bank to possess the "Original" of such a document, defined in the Bond as "the first rendering or archetype" (id. at 3, 7). RLI also points out that the Bond's anti-bundling provision places a further condition on Agreement E's physical possession requirement (id. at 11):

> If any Insuring Agreement requires that an enumerated type of document be altered or counterfeit, or contain a signature which is a Forgery . . . the . . . signature must be on or of the enumerated document itself not on or of some other document submitted with, accompanying or incorporated by reference into the enumerated document.

Both parties agree that at the time of loan issuance Park National possessed "Original" Lease Schedules but not the "Original" Master Lease. RLI contends that this fact, taken together with the Bond provisions, defeats FDIC's claim.

That argument turns on whether the Lease Schedules (as contrasted with the Master Lease) qualify as the "Original" security agreements. On that score, even a cursory reading of those Lease Schedules confirms that they are themselves security agreements as defined in the Bond: Those Lease Schedules contain the forged signatures, they are the documents upon which FDIC relied and -- most importantly -- they incorporate by reference all the terms of the Master Lease. In fact, of the just five paragraphs of terms contained in the Lease Schedules, one of them is devoted to incorporating the Master Lease: "The terms and conditions of Master Equipment Lease Agreement dated December 14, 2001 are herein incorporated by reference" (RLI Ex. H). Given that the Lease Schedules themselves (1) contain all the material terms of the Master Lease, (2) are legally operative documents, (3) contain the forged signatures upon which FDIC relied and (4) were in the possession of FDIC at the time it extended the loans, FDIC has clearly satisfied the physical possession requirements of Insuring Agreement E.

But what of the Bond's anti-bundling provision referred to earlier, which places explicit restrictions on incorporation by reference? That provision requires only that the "signature must be on or of the enumerated documents itself" rather than on "some other document . . . incorporated by reference into the enumerated document" (F. Ex. 4 at 11). This opinion has already explained that the Lease Schedules <u>were</u> the "enumerated documents" upon which FDIC relied, and those Lease Schedules themselves contained the forged signatures. Hence the anti-bundling provision is simply inapplicable by its very terms, for the relevant signatures do not appear on some <u>other</u> document incorporated by reference.

By contrast, if the forged Moody's signatures had appeared only on the Master Lease and had been incorporated by reference into an unsigned Lease Schedule, the anti-bundling provision would prevent that unsigned Lease Schedule from satisfying the Bond conditions. But that is not the case here, and once again the anti-bundling provision is totally irrelevant to the present dispute. In short, FDIC's physical possession of the Lease Schedules also satisfies Insuring Agreement E's requirements.

### FDIC's Losses Resulted Directly from the Forgery

RLI's next fallback position is that FDIC's loss assertedly falls outside the coverage provided by Insuring Agreement E because that loss was directly caused by worthless collateral rather than by forgery. To that end it points to language in Insuring Agreement E that limits coverage to "[l]oss resulting directly from the Insured" having extended credit on the faith of a Security Agreement bearing a forged signature. According to RLI, Insuring Agreement E excludes coverage when collateral would have been worthless even if the forged signature had been genuine. And on that score RLI Mem. 12 quotes <u>Flagstar Bank, FSB v. Fed. Ins. Co.</u>, 2006 WL 3343765, at *8 (E.D. Mich. Nov. 17, 2006) as teaching that FDIC "must show more than the

fact the forgeries caused it to enter into the transactions with [the borrower]; it must also show that these forgeries directly caused its loss."  Because the lease transactions represented by the forged Lease Schedules never took place -- no agreement was reached between Moody's and Sysix, and no consideration was ever given by Sysix in the form of equipment -- RLI argues that the collateral was fictitious and FDIC's losses did not result directly from the forgery.

In purely textual terms that is not how Insuring Agreement E reads -- it requires only "Loss resulting directly from the Insured having . . . extended credit or assumed liability, on the faith of any . . . Security Agreement, which (i) bears a handwritten signature of any makers . . . which is a Forgery."  That language literally appears to contemplate that the loss may "result directly" merely from such good faith reliance on a document that <u>contains</u> a forged signature.

But RLI points to a number of cases suggesting that coverable loss must instead result directly from the forged signature, rather than merely from a document that contains such a signature.  Put another way, the position is that loss must result "directly from" the forgery in the sense that the forgery itself caused the loss.[8]  That is, if the loss would have occurred even if the forged signature had been genuine -- if, for instance, the collateral would have been essentially worthless even if the signatures had been genuine -- that loss is not covered by the Bond.

That reading of Insuring Agreement E does appear to jibe with the basic purpose underlying financial institution bonds:  to protect the insured bank against the risks of fraud and forgery, rather than to function as "a policy of credit insurance" (<u>Bank of Bozeman v.</u>

---

[8]  Several of the cases RLI relies on discuss insuring agreements whose language is more favorable to RLI's proposed interpretation than the Bond at issue here.  That is true of <u>Flagstar Bank</u>, in which the relevant insuring agreement protected only against "Loss resulting directly from: Forgery . . ." rather than loss from a <u>document</u> that bears a forged signature (see <u>Flagstar,</u> 2006 WL 3343765, at *3).

BancInsure, 404 F. App'x 117, 119 (9th Cir. 2010). Financial institution bonds are needed because "[a] bank cannot protect against counterfeit and forged documents," whereas a bank can protect itself against the risk of worthless collateral "through credit checks, appraisals, title searches, financial statements and the like" (Liberty Nat'l Bank v. Aetna Life & Cas. Co., 568 F. Supp. 860, 863 (D. N.J. 1983)). So, the argument goes, the parties to a financial institution bond place the risk stemming from forgery on the insurer and the risk stemming from worthless collateral on the insured bank.

That claimed "fictitious collateral" limitation thus has force, for it restricts the scope of coverage to risks against which a bank is powerless to protect itself. But FDIC also musters cases in support of its proposed more literal reading of the scope of Insuring Agreement E.

In the end, all of the caselaw invoked by both sides either does not bind this Court or is readily distinguished. But the seeming dilemma of having to choose between the opposing positions proves to be a false dilemma, because a closer look at the cases reveals a line that accords both with a logical reading of the Bond's language and with the fundamental purpose of the Bond: Losses resulting from forged documents that merely describe or value collateral do not fall within the ambit of Agreement E, whereas losses from forged documents that are themselves collateral are covered by Agreement E. As Beach Cmty. Bank v. St. Paul Mercury Ins. Co., 635 F.3d 1190, 1196 (11th Cir. 2011) formulates the issue:

> St. Paul erroneously relies on decisions from other courts that have held that a bank did not satisfy the requirement of a financial institution bond that a loss 'result[ ] directly from' reliance on a forgery when the forged documents either described non-existent collateral or misrepresented the value of collateral.[9]

_____

[9] [Footnote by this Court] Beach Cmty. Bank, id. then went on to cite, as opposed to those "other courts" decisions, our own Court of Appeals' decision in the Bank of Manitowoc case discussed favorably later in this opinion.

That distinction between forgery describing collateral and forgery that is itself collateral accounts for the differing rulings in Forcht Bank, N.A. v. BancInsure, Inc., 514 F. App'x 586 (6th Cir. 2013) and Beach Cmty. Bank.  In Forcht Bank a lender extended credit to a borrower, relying on that borrower's life insurance policy as collateral.  In choosing to issue the loan Forcht Bank relied upon a letter purportedly written and signed by the policy issuer that grossly overstated the cash value of the policy.  After the letter was revealed to be a forgery, Forcht Bank sought coverage of the loss under Insuring Agreement E, which the Court of Appeals for the Sixth Circuit refused, reasoning that the forged letter did not "directly cause" Forcht Bank's loss.

RLI seeks to invoke Forcht Bank in support of its position, but the facts of that case clearly differ in a key respect from those at issue here:  In Forcht Bank the fabricated document was a letter, addressed to the recipient of the life insurance policy, merely describing non-existent collateral -- a letter that had no independent legal force.  By sharp contrast, in Beach Cmty. Bank, as in this case, the collateral itself contained a forged signature.[10]

In Beach Cmty. Bank a bank loan was conditioned on receiving guaranties from a wealthy developer and his wife.  Ultimately the wife's signature proved to be a forgery, and upon the borrower's default the bank learned that the developer and his wife were deeply in debt and had lost nearly all their assets, and in any event those assets would not have been reachable because the wife's signature had been forged.  Although the insurer argued that was a case of fictitious collateral -- because even if the wife's signature had been genuine, there were no assets to collect -- the court ruled for the bank, reasoning that the forgery directly caused the bank's loss

_____

[10]    Again remember that here the forged Lease Schedules were themselves the collateral.

because "an authentic guaranty from Juanita would have had value" because it imposed a legal obligation, even if she did not at that time have assets (<u>Beach Cmty. Bank</u>, 635 F.3d at 1196).

That result accords with common sense, for a primary purpose of the Bond is to protect the bank against the risk of forged collateral. While covered banks cannot evade their responsibility to evaluate the creditworthiness of potential borrowers simply by relying on forged documents describing the value of that collateral, they are entitled to rely on the authenticity of signed documents purporting to serve as collateral.

This case fits squarely within that second category of loss, because as already stated the forged Leases were collateral for the loan rather than a mere description of the value of other assets. Had Moody's agents actually signed the Leases, those Leases would have had value. Such a state of affairs differs crucially from a scenario in which FDIC might have relied on a forged letter from a Moody's employee falsely <u>describing</u> the existence or value of leases. Because the Leases in this case were themselves the collateral rather than merely describing or valuing collateral, FDIC's losses resulted directly from the forged signatures on those leases.

It must be said (albeit belatedly) that all of the foregoing fine tuning may well have given RLI more than its due, for the preceding discussion has proceeded on the premise that the doctrine of fictitious collateral would be good law in this Seventh Circuit. But <u>First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.</u>, 485 F.3d 971 (7th Cir. 2007), which dealt with facts remarkably similar to those before this Court, casts more than major doubt on that premise. In <u>Bank of Manitowoc</u> an insured bank extended loans to a used-car dealership, relying upon vehicle leases as collateral. Ultimately those vehicle leases turned out to have been doctored and the signatures of the lessees forged. Dismissing the arguments that Insuring Agreement E did not cover the bank's loss (and rejecting many of the same cases cited here by RLI), the opinion in

<u>Bank of Manitowoc</u>, <u>id.</u> at 979-80 confirmed that the leases fell within Insuring Agreement E's ambit:

> Cincinnati asserts that "courts have overwhelmingly held" that Insuring Agreement E does not cover losses from loans based on forged documents describing fictitious transactions or assets. This is not true. Of the cases Cincinnati cites, only four are appellate decisions. Two of the four concerned not loss causation but the so-called "actual physical possession" prerequisite to coverage under Insuring Agreement E. See <u>Republic Nat'l Bank of Miami v. Fid. & Deposit Co. of Md.</u>, 894 F.2d 1255, 1262-63 (11th Cir. 1990) . . . ; <u>Nat'l City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co.</u>, 447 N.W.2d 171, 177 (Minn. 1989) . . . .
>
> The remaining appellate decision Cincinnati cites on this point was scantily reasoned. <u>Georgia Bank & Trust v. Cincinnati Insurance Co.</u>, 245 Ga.App. 687, 538 S.E.2d 764, 766 (2000), involved a Cincinnati Bond similar to the one at issue here. Georgia Bank & Trust extended credit based on forged documents confirming the existence of certain accounts that served as collateral for the loan. When the debtor defaulted, Georgia Bank filed a claim for its loss with Cincinnati. The Georgia court of appeals cited both Insuring Agreements D and E in its very brief opinion; without specifically addressing the language of either, the court accepted Cincinnati's argument that its Bond does not cover losses resulting from the nonexistence of assets assigned by a forged instrument. The court concluded that "the blanket bond did not protect the bank from its bad business deal. Even if the signature on the confirmation was authentic, the bank would have suffered the loss, because the assets did not exist." <u>Id.</u> This conclusion ignores the practical reality of the situation; but for the forged documents purporting to verify the existence of the collateral, credit would not have been extended in the first place, and there would have been no loss. It also ignores the plain language of Insuring Agreement E, which covers loss "by reason of" the Bank "having . . . extended any credit . . . or otherwise acted upon any . . . document" that "proves to have been a forgery." As here, the loss at issue in Georgia Bank easily fit within this coverage language. The case is unpersuasive and we decline to follow it.

So the Bank's loss is covered by Insuring Agreement E.

RLI seeks to escape the impact of that language and holding by contending that the financial institution bond at issue in <u>Bank of Manitowoc</u> contained less restrictive causal language than the Bond here, in that it covered loss "by reason of" forgery rather than only loss "directly resulting" from forgery (<u>id.</u>). But that claimed distinction much resembles the white

horse-dark horse "distinction" that used to be taught in the first year of law school to epitomize a

distinction without a difference, for <u>First State Bank of Monticello</u>, 555 F.3d at 571 reads the

"resulted directly" standard in the context of Insuring Agreement B in a broad and

common-sense manner:

> Insuring Agreement B's coverage of losses resulting "directly from" on-premises
> false pretenses means what it says. The bond's "direct loss" requirement "must be
> afforded its plain and ordinary meaning; 'direct' means direct.'

> *      *      *

> What is important is that without Stilwell's on-premises misconduct -- without the
> false pretenses under which he tendered his checks -- First State Bank would not
> have suffered a loss. First State Bank's loss thus resulted "directly from" Stilwell's
> on-premises false pretenses, and there is coverage under Insuring Agreement B.

In this case too, had FDIC not relied on the forged signatures of Moody's employees it

would not have suffered a loss. Thus under either <u>Bank of Manitowoc</u> or the fictitious collateral

cases discussed earlier, FDIC's losses here resulted directly from forgery and are covered under

Insuring Agreement E.

### FDIC Did Not Repurchase the Loans

With all of the already-discussed rhetorical strings to its argumentative bow having

broken under the force of analysis, RLI reaches into the bottom of its figurative quiver and

comes up with the opinion in <u>Universal Mortgage</u> (quoted earlier in this opinion) to contend that

FDIC's loss resulted not from forgery but from an obligation to repurchase the Loans from a

third party -- a cause of loss not covered by the Bond. In <u>Universal Mortgage</u> some employee

misconduct caused a mortgage lender to issue substandard loans. Those loans were then sold to

third-party buyers. When those buyers realized the loans were substandard, they exercised a

contractual right to force Universal Mortgage to repurchase the loans, causing significant

financial loss. Universal Mortgage then sought reimbursement under a financial institution bond but was unsuccessful because its loss had been "directly caused" not by employee dishonesty but by its contractual duty to repurchase the loans (651 F.3d at 763).

RLI attempts to analogize Universal Mortgage to the present case, pointing to FDIC's Purchase Agreement with U.S. Bank and seeking to characterize that Agreement as a sale of the Loans to U.S. Bank followed by a subsequent repurchase by FDIC. But RLI's own statement of facts (as well as its response to FDIC's statement) gives the lie to any such characterization. That agreement was instead a loss-sharing arrangement, with the amount of that loss determined by U.S. Bank after the initial transfer of Park National's assets and liabilities (see RLI St. ¶¶ 31-42; F. St. ¶¶ 70-76). When U.S. Bank entered into the Purchase Agreement FDIC had already discovered that the Lease signatures were forged, had filed suit against Rockwell and Moody and had informed RLI of the forgery (RLI St. ¶¶ 36-37). Only then did FDIC negotiate its Purchase Agreement, which transferred Park National's assets and liabilities to U.S. Bank but also required FDIC to pay 80% of the covered loss on each commercial loan, with U.S. Bank absorbing the remaining 20% of the loss (F. St. ¶¶ 71-72). Under the Purchase Agreement that absorption would necessarily occur after the transfer of the assets, with FDIC reimbursing U.S. Bank for 80% of subsequent charge-offs (F. St. Ex. 49 at 107). FDIC and U.S. Bank complied with those terms of the Purchase Agreement, with U.S. Bank submitting chargeoffs in December of 2009 and September of 2011 and FDIC reimbursing U.S. Bank for 80% of the charged-off amount (RLI St. ¶ 41; F. St. ¶¶73-74).

It frankly cannot be argued in good faith that FDIC "repurchased" any loans. Instead it bargained with U.S. Bank for a sharing of the loss on the Loans, with the exact amount of the loss determined by U.S. Bank's later chargeoff. Although RLI attempts to distort that

arrangement into a sale and repurchase, FDIC never regained possession of the Loans, and its duty to reimburse U.S. Bank for 80% of the loss was fixed by the same Purchase Agreement that it entered into in order to mitigate its losses.

Thus the Universal Mortgage analysis and holding simply do not apply to the facts of this case. FDIC's mitigation of its loss through the Purchase Agreement, which actually operates to reduce the amount RLI would need to cover under the Bond, deserves RLI's gratitude rather than justifying an attempt to evade its responsibilities under the Bond.

### FDIC Relied in Good Faith on the Leases

In its final substantive attack RLI questions whether FDIC relied in good faith on the Lease Schedules. RLI attempts to present two separate arguments in support of that attack. Unsurprisingly in light of its failures to this point, those contentions come up empty as well.

RLI first asserts that the deposition testimony of Park National's Senior Vice President Richard Dunbar ("Dunbar"), in which he stated that he relied in good faith on the documents from Rockwell and Moody, is "conclusory testimony without any foundation" and thus inadmissible (RLI R. Mem. 17). But that statement is not at all "conclusory" in the same sense that an assertion that a conspiracy existed is conclusory (see Williams v. Seniff, 342 F.3d 774, 785 (7th Cir. 2003), the only case that RLI cites in support of its argument). Instead Dunbar testified to his own subjective state of mind, a topic that he is undoubtedly competent to discuss. In fact Bank of Manitowoc, 485 F.3d at 978 n.6 relied upon just such testimony in establishing the good faith reliance of bank employees. RLI's argument is so patently groundless that it should never have been advanced at all.

RLI next argues that FDIC did not rely on the Lease Schedules because it performed insufficient investigation into the existence of the Leases and ignored red flags visible in the loan

documents. There were indeed failings in FDIC's due diligence process: It did not take steps to verify the existence of the collateral, to inquire of Moody's employees as to whether the Leases had ever been executed or to perform other basic investigation into the authenticity of the Leases. Those facts cast doubt on the competence of Park National and might well suffice to prove negligence on its part.[11]

But mere negligence does not defeat coverage under Insuring Agreement E.[12] <u>Bank of Manitowoc</u>, 485 F.3d at 978 (footnote omitted) makes clear that banks have no obligation under that Bond provision to investigate the authenticity of documents:

> We have stated that "'good faith' usually establishes a subjective standard," and pointed out that "[m]any negligent acts are committed with pure hearts and empty heads," <u>State Bank of the Lakes v. Kan. Bankers Sur. Co.</u>, 328 F.3d 906, 909 (7th Cir. 2003). Cincinnati asserts there are material issues of fact regarding whether the Bank was "selectively ignorant" in extending credit to Kust; however, its corporate designee conceded that Bank employees acted honestly and in good faith, with no knowledge of Kust's fraudulent scheme. We hold the good-faith requirement does not impose a "sound business practices" prerequisite to coverage.

---

[11] RLI also points out that Park National failed to discover that Moody's representative, Gunter, was no longer employed by it at the time of the Second Lease's execution, having ceased to work for it during the period between the forgery of the First Lease and the forgery of the Second Lease (RLI St. ¶ 28). That change in Gunter's employment was obviously not known to Sheaffer when he signed Gunter's name to the Second Lease. RLI faults Park National for not having been alerted to the forgery by that discrepancy, arguing that even if Gunter had signed the Second Lease it would have been ineffective as executed without authority. FDIC responds by claiming that Park National employees attempted to contact Gunter and were assured by Moody's representatives that the leased equipment existed and had been received. In any event, Park National's alleged negligence in failing to verify Gunter's continued employment is no different in kind from its negligence in other instances.

[12] <u>Republic Nat'l Bank of Miami v. Fid. & Deposit Co. of Md.</u>, 894 F.2d 1255 (11th Cir. 1990) and <u>Continental Bank v. Phoenix Ins. Co.</u>, 101 Cal. Rptr. 392 (Cal. Ct. App. 1972), both cited by RLI, are simply inapposite.

Other Courts of Appeals agree -- see. e.g., <u>Beach Cmty. Bank</u>, 635 F.3d at 1200, quoting <u>First</u>

<u>Nat'l Bank of Fort Walton Beach v. U.S. Fid. & Guar. Co.</u>, 416 F.2d 52, 57 (5th Cir. 1969):

> We have held that the requirement of good faith in the forgery provision of a
> financial institution bond does not bar recovery under Florida law when the
> insured failed to verify the legitimacy of financial statements because "[o]rdinary
> negligence, without more, does not convert good faith into bad."

Such cases squarely establish that RLI must identify evidence suggesting more than

inattention on the part of FDIC.  Instead it must show (at a minimum) that FDIC ignored red

flags obvious on the face of documents in a way that could be characterized as "selectively

ignorant" (see <u>Bank of Manitowoc</u>, 486 F.3d at 978).  This case is not at all akin to such cases as

<u>FDIC v. Cincinnati Ins. Cos.</u>, 2013 WL 5971997 (N.D. Ga. Oct. 5, 2013), in which a bank failed

to satisfy the good faith requirement when it ignored numerous red flags in a sales contract.  By

contrast, here FDIC had no reason to suspect from the face of the Leases that they were forged.[13]

It must be concluded that FDIC relied in good faith on the Leases.

### FDIC Complied with the Applicable Statute of Limitation

In a last-ditch effort to save the day, RLI raises the issue of contractual limitations on

suit.  RLI notes correctly that the Bond required Park National to institute an action for coverage

within 24 months of discovery of loss.  Discovery in this case occurred at the latest by

September 25, 2009, when Park National filed suit against Rockwell and Moody (R. St.

¶¶ 36-37), and FDIC did not commence this action until May 6, 2012 -- significantly after the

contractual limitation had taken effect.  Bu in that respect RLI runs head on into 12 U.S.C.

---

[13]  RLI raises a minor quibble as to which of Sysix's top officials had authority to sign the
Lease Schedules -- it will be recalled that it was its President John Sheaffer who did so and who,
at the same time, was guilty of forging the signature of Moody's Vice President Gunter.
Sheaffer's signature on Sysix's behalf is scarcely the type of obvious red flag that was exhibited
in <u>Cincinnati Ins.</u>

§ 1821(d)(14)(A) ("Section 1821"), which understandably provides an extended statute of limitations when the FDIC is appointed receiver of an institution:

> Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be --
>
> (i)  in the case of any contract claim, the longer of --
>        (I)  the 6-year period beginning on the date the claim accrues; or
>        (II) the period applicable under State law . . . .

That statute of course supersedes the two year limitation period provided by the Bond and renders this action timely.

RLI Mem. 19 inexplicably tries to escape from the clutches of Section 1821 by arguing that the statute applies only to state statutes of limitations and not to a contractual suit limitation. But like all too many of RLI's legal positions here, that ignores the clear text of Section 1821, which expressly refers to the "provision of any contract" -- a phrase that would be entirely out of place if Congress did not intend to supersede both contractual and statutory limitations. Unsurprisingly the caselaw holds just that (see, e.g., <u>FDIC v. New Hampshire Ins. Co.</u>, 953 F.2d 478, 485-87 (9th Cir. 1991)), and RLI has failed to unearth any cases to the contrary.  RLI's last gasp fails as well.[14]

_____

[14]  "Last gasp" is perhaps an overstatement:  In a single footnote (RLI Mem. 20 n.12), RLI appears to claim -- without citation to caselaw or significant explanation -- that Section 1821 is constitutionally infirm by reason of violating (1) the Contract Clause, (2) the Commerce Clause and (3) the Fifth Amendment's prohibition on uncompensated takings.  That half-baked argument flouts its counsel's Rule 11(b) obligation to exercise both objective and subjective good faith -- to make two quick points to torpedo RLI's position:  (1) Section 1821 predated the issuance of the Bond and was therefore part of the legal background against which the parties were contracting, and (2) contrary to RLI's assertion, Congress has repeatedly and frequently regulated the economic activities of intrastate actors (see, e.g., <u>Wickard v. Filburn</u>, 317 U.S. 111 (1942)).  That latter point is especially salient when one of the parties to these "intrastate"
<span style="float:right">(continued)</span>

**Conclusion**

Despite RLI's attempts to frame (or reframe) the undisputed facts so as to avoid coverage under the Bond, the inevitable conclusion remains: FDIC suffered a loss resulting directly from its good faith reliance on Security Agreements (the Leases) containing forged signatures. It had those original Security Agreements in its possession at the time that it extended the loans to Rockwell. And it commenced this action within the applicable statute of limitations.

Accordingly its losses are covered by Insuring Agreement E of the Bond, so that FDIC's motion for summary judgment must be granted and RLI's motion must be denied. This Court sets a next status hearing date at 8:45 a.m. June 17, 2014 to discuss the nature and timing of future proceedings in the case.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 10, 2014

_____

(footnote continued)

contracts was a federally insured and regulated bank that participates in the financial marketplace.